IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| JUAN LEONARDO SIMMONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:18-05072-CV-RK |
| | ) |
| JOSEPH DRUM, INDIVIDUALLY | ) |
| AND IN THE OFFICIAL CAPACITY; | ) |
| AND MISSOURI STATE HIGHWAY | ) |
| PATROL, | ) |
| | ) |
| Defendants. | ) |

## ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

Plaintiff Juan Simmons ("Simmons") brings this damages action under 42 U.S.C. § 1983 against Missouri State Highway Patrol ("MSHP") and against state trooper, Joseph Drum ("Drum") in both Drum's individual capacity and official capacity (collectively, "Defendants"). Before the Court is Defendants' Motion to Dismiss. (Doc. 5.) The motion is fully briefed. (Docs. 6, 8, 9.) For the reasons below, the motion is **GRANTED in part** in that claims against MSHP in Counts I, II, and III are **DISMISSED**; claims against Drum in his official capacity in Counts I, II, and III are **DISMISSED**; and the claim against Drum in his individual capacity in Count II is **DISMISSED**. The remaining claims are against Drum in his individual capacity in Counts I and III.

## Background

**I. Facts**

The Court accepts as true the well-plead factual allegations in Simmons' Complaint and views them in the light most favorable to Simmons. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 821 (8th Cir. 2018).

The Complaint alleges that on May 2, 2014, MSHP Trooper Drum arrested Simmons for driving with a suspended license and municipal warrants. At the scene of the arrest, Drum conducted a pat down search of Simmons and searched the vehicle Simmons was driving. Drum found no weapons or illegal contraband. Drum then drove Simmons to the Joplin City Jail (the "Jail"). During the drive, "Drum began lecturing [Simmons] and [Simmons] told Drum that he

did not need a lecture." (Doc. 1 at ¶ 11.) In response, Drum said "something along the lines of[:]" "Oh, so that's how it's going to be? We'll see about that when we get to the jail." (Doc. 1 at ¶ 12.)

At the Jail, jail personnel conducted a search of Simmons in Drum's presence. No weapons or contraband were found. Drum indicated that he wanted Simmons strip searched. Jail personnel told Drum that a strip search was unnecessary and "that they were not going to conduct a strip search." (*Id.* at ¶ 16.) Jail personnel told Drum "that he did not have authority or permission to conduct a strip search of Plaintiff at their facility and that he was not following their established procedures for conducting such a search." (*Id.* at ¶ 17.) The Complaint also alleges that the jail personnel were "not going to place [Simmons] in the general population or in substantial contact with other inmates." (*Id.* at ¶ 25.) Drum indicated he was still going to conduct a strip search. At this point, jail personnel went to find supervisors to intervene, and Drum proceeded with the strip search of Simmons.

Drum's search of Simmons at the Jail is the subject of Simmons' lawsuit. During the search, "while [] Simmons was handcuffed behind his back, [] Drum unbuttoned and unzipped [] Simmons' pants and purposely made contact with [] Simmons' penis with a pen." (*Id.* at ¶ 20.) The Complaint also alleges that during the search, Drum made "embarrassing and scornful comments . . . about [Simmons'] body and genitals." (*Id.* at ¶ 28.) It is undisputed that, at all times relevant, Drum was acting in the course and scope of his employment and under color of state law.

## II. The Complaint and Pending Motion

In August 2018, Simmons filed his Complaint asserting two constitutional claims pursuant to 42 U.S.C. § 1983. Specifically, Simmons alleges that the search conducted by Drum at the Jail violated his Fourth Amendment right to be free from unreasonable searches (Count I) and violated his First Amendment right to free speech (Count III).[1] He also asserts that the search constituted assault (Count II).[2] As to all counts, Simmons sues MSHP, and Drum in both his individual and official capacities.

---

[1] Although the three counts in Simmons' Complaint are not labeled, Simmons does not contest this characterization of his claims, which is stated in Drum's motion.

[2] The Court has jurisdiction over Simmons' federal claims under 28 U.S.C. § 1331, and the Court may exercise supplemental jurisdiction over Simmons' state law claims pursuant to 28 U.S.C. § 1367.

Defendants moves to dismiss the claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), raising four grounds: (1) the claims against MSHP are barred by the Eleventh Amendment; (2) the claims brought under § 1983 against Drum in his official capacity are barred by Eleventh Amendment immunity; (3) the claims brought under § 1983 against Drum in his individual capacity are barred by qualified immunity because he did not violate a clearly established First and Fourth Amendment right; and (4) the state law claim in Count II is barred by the statute of limitations. In response, Simmons concedes grounds 1, 2, and 4. The Court will grant Defendants' motion on these three grounds. The Court proceeds to address ground 3, the question of whether Drum is entitled to qualified immunity on Simmons' constitutional claims in Counts I and III.

## Discussion

### I. Legal Standard

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court "accept[s] the well-pled allegations in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." *Meiners*, 898 F.3d at 821.

### II. Qualified Immunity

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.*

In the motion to dismiss, Drum focuses on the second prong and does not address the first prong. Regarding the second prong, Drum argues that Simmons has not pleaded sufficient facts to establish that Drum violated clearly established constitutional rights. On this point, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would

[have understood] that what he is doing violates that right." *Id.* at 741 (quotation marks and citation omitted). This does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations omitted). "Although the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff must demonstrate that the law was clearly established." *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (citations omitted). "To overcome qualified immunity, a plaintiff typically must identify either 'cases of controlling authority in their jurisdiction at the time of the incident' or 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Jacobson v. McCormick*, 763 F.3d 914, 918 (8th Cir. 2014) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

Accordingly, to defeat Drum's assertion of qualified immunity, Simmons must show, by citation to then-existing case law, that the "violative nature" of Drum's particular conduct was clearly established at the time the conduct occurred. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). In the Complaint, Simmons asserts that Drum's search violated rights under both the Fourth and First Amendments.

### A.  Fourth Amendment Right to be Free From Unreasonable Searches

Simmons has the burden to demonstrate that he has pled facts showing that the Fourth Amendment right he asserts Drum violated was clearly established at the time of Drum's search. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

> The test of reasonableness under the Fourth Amendment
>
> requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.*

Simmons first appears to argue that the search of his genitals was per se illegal in absence of reasonable suspicion that he was concealing contraband. In support, Simmons maintains that under Eighth Circuit case law, a "reasonable suspicion standard" should be applied to body searches of arrestees. *See McDonell v. Hunter*, 809 F.2d 1302, 1306 (8th Cir. 1987) (citing *Jones*)

4

(reasonable suspicion required for strip searches of correction officers while working at correctional facilities); *Jones v. Edwards*, 770 F.2d 739, 741 (8th Cir. 1985) (citing *John Doe*) (reasonable suspicion required for strip searches of minor-offense arrestees); *Hunter v. Auger*, 672 F.2d 668, 670 (8th Cir. 1982) (reasonable suspicion required for strip searches of jail visitors); *John Does 1-100 v. Ninneman*, 612 F. Supp. 1069, 1071 (D. Minn. 1985) (same as *Jones*). However, the holding in *Jones* and *John Does 1-100* that a strip search of a detainee always requires reasonable suspicion was implicitly overruled by the Supreme Court's decision in *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318 (2012). *See id.* at 351-52 (Breyer, J., dissenting) (citing *Jones* as one of the seven court of appeals decisions that had previously required reasonable suspicion of a minor-offense arrestee before a strip search); *Rattray v. Woodbury County*, 908 F. Supp. 2d 976, 992 (N. D. Ia. Dec. 10, 2012) (*Florence* overruled *Jones* for their "holding that a strip search of an adult detainee *always* requires reasonable suspicion."). Instead, *Florence* held that the reasonableness test announced in *Bell v. Wolfish* applies. 556 U.S. at 330.

Therefore, the Court turns to *Bell's* test for reasonableness to determine whether Simmons had a clearly established right not to be searched on these particular facts. 441 U.S. at 559. Balancing the four prongs in *Bell* based on the relevant legal precedent and allegations, Simmons had a clearly established right not to be submitted to a search of his genitals without legitimate justification. At this juncture, Simmons has plausibly pled that a reasonable officer faced with the same circumstances as Drum would have known that the search of Simmons' genitals without a legitimate justification was unreasonable.

### 1. Place

To begin, the Complaint alleges that Drum conducted the search at a jail. (Doc. 1 at ¶¶ 17, 19.) There are no allegations that Simmons was seen during the search by anyone other than Drum. *Cf. United States v. Williams*, 477 F.3d 974, 977 (8th Cir. 2007) (reasonableness is a close question where search was conducted in a place open to public view); *Richmond v. City of Brooklyn Ctr.*, 490 F.3d 1002, 1008 (8th Cir. 2007) ("strip searches should be conducted by officials of the same sex as the individual to be searched" and "in an area as removed from public view as possible without compromising legitimate security concerns").

## 2. Scope

Regarding the intrusiveness of the scope of the search, the Complaint alleges that "while [] Simmons was handcuffed behind his back, [] Drum unbuttoned and unzipped [] Simmons' pants and purposely made contact with [] Simmons' penis with a pen." (Doc. 1 at ¶ 20.)

Simmons again cites to *Jones* and *John Does 1-100* for the proposition that courts look to the nature of the crime committed. The plaintiff in *Jones* was arrested pursuant to a warrant that was issued for failing to sign a summons and complaint for a leash law violation. 770 F.2d at 740. One plaintiff in *John Does 1-100* was arrested on a warrant for failure to appear at a hearing related to child support, and the other plaintiff was arrested for driving after his license had been revoked. 612 F. Supp. at 1070. Similarly, Simmons was arrested for municipal warrants and driving with a suspended license. (Doc. 1 at ¶ 9.) As in *Jones* and *John Does 1-100*, there is no indication that the nature of Simmons' crime is of "the sort . . . to inspire officers with the fear of introducing weapons or contrabands into the holding cell." 770 F.2d at 741. However, the significance of the nature of the arrest is less clear after the Supreme Court's decision in *Florence*. In *Florence*, the Supreme Court implicitly overruled the holdings in *Jones* and *John Does 1-100*, reasoning that "the seriousness of an offense is a poor predictor of who has contraband." 566 U.S. at 334. Justice Alito, in his concurring opinion, stated that "[t]he Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer." *Id.* at 342 (Alito, J., concurring).

The Court observes that there are concerns regarding strip searches that involve physical touching of detainees.[3] *See Florence*, 566 U.S. at 339 ("There also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees."). Such concerns involving touching were not implicated by the facts in *Florence*, *Jones*, and *John Does 1-100*.

---

[3] The Supreme Court in *Florence* observed that the use of the term "strip search" is imprecise. 566 U.S. at 326. The Supreme Court explained that the term

> may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position.

*Id.*

6

566 U.S. at 325 ("In the instant case, the term [strip search] does not include any touching of unclothed areas by the inspecting officer."); 770 F.2d at 739 (non-contact visual strip search); 612 F. Supp. at 1070 (strip search policy involved submission to "complete visual search").

Drum highlights the facts that Simmons was not required to fully disrobe, citing to *Williams*. In *Williams*, an "officer, who was wearing a latex glove, opened Williams' pants, reached inside William's underwear, and retrieved" drugs. 477 F.3d at 975. The Eighth Circuit found that physical contact with a person's genitals during a search is not per se unreasonable and that "the existence of 'less intrusive means' does not, by itself, make a search unreasonable." *Id.* at 976. The Eighth Circuit also observed that a reasonable officer could conclude that incidental contact that resulted from the search inside a suspect's pants was a lesser intrusion than forcing him to completely disrobe and subject to a visual search. *Id.* However, the balancing inquiry in *Williams* is distinguishable. An initial pat down search of Williams produced specific probable cause that Williams was hiding something inside his pants and physical contact was unavoidable to remove the drugs. *Id.* at 975.

### 3. Manner

The Complaint alleges that the search at issue was abusive and that Drum purposefully made contact with Simmons' genitals only to humiliate him. The Complaint further alleges that during the search, Drum made "embarrassing and scornful comments . . . about [Simmons'] body and genitals." (Doc. 1 at ¶¶ 19, 28.) Although Drum's subjective motivation is irrelevant for purposes of determining constitutional reasonableness based on the objective circumstances, *see Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)), searches conducted in an "abusive" fashion are unreasonable, *see Bell*, 441 U.S. at 560; *Florence*, 566 U.S. at 339 (noting concerns "about instances of officers engaging in intentional humiliation or other abusive practices"). Accordingly, what is relevant for purposes of the reasonableness analysis is that Simmons has plausibly pled the search was conducted in an abusive fashion irrespective of Drum's subjective motivation.

### 4. Justification

The Complaint alleges that Drum's search was conducted without justification. (*See e.g.*, Doc. 1 at ¶¶ 19, 21, 24.) The plausibility of this claim is supported by the allegations regarding the circumstances in which the search occurred. Before Drum's search, Simmons had already

7

submitted to a pat down search and a second search by jail personnel, neither of which resulted in finding weapons or contraband. (*Id.* at ¶¶ 10, 14.) Jail personnel had expressed their opinion that a strip search was unnecessary and "that they were not going to conduct a strip search." (*Id.* at ¶ 16); *see Florence*, 566 U.S. at 322-23 (courts defer to judgment of correctional officers in addressing constitutionality of jail search procedures). Jail personnel had also expressed "that he did not have authority or permission to conduct a strip search of Plaintiff at their facility and that he was not following their established procedures for conducting such a search." (*Id.* at ¶ 17); *see* 566 U.S. at 328 (recognizing the legitimate interest in maintaining institutional security). Further, the Jail "was not going to place [Simmons] in the general population or in substantial contact with other inmates." (*Id.* at ¶ 25); *see* 566 U.S. at 333 (recognizing substantial interest in conducting thorough searches of new inmates who will be admitted to the general population).

Balancing the four prongs in *Bell* based on the allegations, Simmons had a clearly established right not to be submitted to a search of his genitals without legitimate justification. Therefore, the Court will deny Drum's motion to dismiss Simmons' individual-capacity claim against him in Count I based on qualified immunity.

B. **First Amendment Right to Free Speech**

Simmons has the burden to demonstrate that he has plead facts showing that the First Amendment right he asserts Drum violated was clearly established at the time of Drum's search. It is settled that as a general matter, "the *First Amendment* prohibits government officials from retaliating against a citizen for exercising his right of free speech." *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070 (8th Cir. 2017).

> "[T]o establish a First Amendment retaliation claim in a particular case, a plaintiff must show (1) that he engaged in a protected activity, (2) that the defendant's actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, and (3) that a causal connection exists between the retaliatory animus and the injury."

*Id.* At this juncture, Simmons has satisfied the test under the First Amendment by plausibly pleading that Simmons had a clearly established First Amendment right not to be submitted to a search of his genitals in retaliation for criticizing a state trooper.[4]

---

[4] Drum maintains that Simmons must show that it was clearly established that he had a specific right to be free from a retaliatory search that is otherwise reasonable. However, the proposition that the search at issue was reasonable has not been shown at this point.

8

### 1. Protected Activity

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). "Criticism of public officials lies at the very core of speech protected by the *First Amendment*." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002) (citation omitted). The Complaint alleges that Simmons made "statements to [Drum] concerning the way [Drum] was handling the arrest." (Doc. 1 at ¶ 52.) Specifically, "[w]hile [Drum] was driving [] Simmons to the [Jail], [Drum] began lecturing [Simmons] and [Simmons] told [Drum] that he did not need a lecture." (Doc. 1 at ¶ 11.) The First Amendment protects Simmons' statement. *See Naucke*, 284 F.3d at 927.

### 2. Chilling Effect

Whether a person of ordinary firmness would be chilled is an objective test: "[t]he question is not whether the plaintiff [him]self was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014) (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)). Simmons cites to Ninth Circuit decisions recognizing "that a retaliatory police action such as an arrest or search and seizure would chill a person of ordinary firmness from engaging in future First Amendment activity." *Ford v. City of Yakima*, 706 F.3d 1188, 1196 (9th Cir. 2013) (citations omitted); *Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990) (police officers may not exercise their authority to retaliate against an individual for his free speech). Although *Ford* and *Duran* are outside this circuit, the Court is persuaded that Eighth Circuit precedent clearly establishes that a search of a person's genitals would chill a person of ordinary firmness from exercising his or her right to free speech. *See e.g.*, *Garcia*, 348 F.3d at 729 (parking tickets totaling $35.00 raises a jury question on whether a person of ordinary firmness would be deterred); *Naucke*, 284 F.3d at 928 (8th Cir. 2002) (recognizing that in some cases, embarrassment, humiliation, and emotional distress is sufficient).

### 3. Causal Connection

"Under the third prong, a plaintiff must show that the retaliatory motive was a 'substantial factor' or 'but-for cause' of the adverse action." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). The question of causal connection "is generally a question for the jury, unless the question of causation is 'so free from doubt as to justify taking it from the jury.'"

*Jones v. City of Minneapolis*, No. 07-3577 (DWF/SRN), 2009 U.S. Dist. LEXIS 84330, at *14 (D. Minn. Sep. 15, 2009) (quoting *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004)). Drum contends that Simmons' allegations on this point are conclusory. The Court disagrees. The plausibility of Simmons' claim that a causal connection exists between Drum's alleged retaliatory animus and the injury is supported by the allegations regarding the circumstances surrounding the search. The Complaint alleges that Simmons criticized Drum. Drum's alleged response suggested that Simmons would be punished once they arrived at the Jail. At the Jail, Drum conducted a search of Simmons' genitals despite no apparent need to do so and despite objections by Jail personnel. During the search, Drum made embarrassing and scornful comments about Simmons' body and genitals.

Therefore, the Court will deny Drum's motion to dismiss Simmons' individual-capacity claim against him in Count III based on qualified immunity.

## Conclusion

After careful consideration, Defendants' motion to dismiss (Doc. 5) is **GRANTED in part** in that claims against MSHP in Counts I, II, and III are **DISMISSED**; claims against Drum in his official capacity in Counts I, II, and III are **DISMISSED**; and the claim against Drum in his individual capacity in Count II is **DISMISSED**. The remaining claims are against Drum in his individual capacity in Counts I and III.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: March 18, 2019